[Civ. No. 22062. Fourth Dist., Div. One. Oct. 24, 1980.]

JOYCE FRANCES VECCHIONE et al., Plaintiffs and Appellants, v. FAYETTE A. CARLIN, JR., et al., Defendants and Respondents.

**COUNSEL**

Ernest R. Fraley for Plaintiffs and Appellants.

Higgs, Fletcher & Mack, Gregg C. Sindici, McInnis, Fitzgerald, Rees & Sharkey and William G. Bailey for Defendants and Respondents.

OPINION

**COLOGNE, J.**—Joyce and Richard Vecchione brought this action against Fayette A. Carlin, Jr., a pediatrician, and Bay General Hospital for the alleged wrongful death of their infant daughter Diana Marie. After the jury returned a defense verdict, the Vecchiones appeal.

Carlin was on the staff of Bay General Hospital in charge of the nursery and was present when Diana was born at 9 a.m. on April 9, 1974. The infant was small (four pounds, seven ounces), premature and was suffering from respiratory distress from birth. On delivery, the baby had no muscle tone, her color was blue to pale, she had poor reflex irritability (a weak cry), her respiratory effort was slow and irregular and her heartbeat was poor. Carlin concluded the child was not receiving adequate oxygen at birth. The mother had had an abruption of the placenta (premature separation of the placenta from the uterus before the baby was born) which, according to medical experts, could produce serious consequences including a fetal-maternal bleed (the baby will bleed backward through the placenta) and hypoxia (insufficient oxygen reaching the brain). The baby was covered with meconium[1]-stained amniotic fluid indicating the baby underwent stress in the uterus.

Carlin examined the infant's vocal cords and had lung X-rays taken to determine no meconium was there and later lavaged the stomach with a normal saline solution. By 9:10, she was placed in an IMI warmer in the hospital nursery and given oxygen to assist her breathing. At about 9:50, a blood sample was taken from the baby's heel showing her blood gas balances were significantly off of average. At 11:30, the baby was still experiencing labored respiration and periodic apnea (stopped breathing).

At 11:45, a catheter was inserted into an artery in the child's umbilicus to be used for administering sodium bicarbonate into the blood stream and as a source of withdrawing more blood samples. In order to keep such samples from coagulating either in the catheter or in the syringes used to withdraw the blood by way of suction, a solution of heparin and normal saline is used to coat the needle and syringe. The solution was prepared by Norma Horine, a registered nurse and employee of the hospital, acting on Carlin's instructions.

---

[1]Meconium is fetal excrement expelled before birth into the amniotic fluid surrounding the developing baby.

According to Horine, she put 1/100th of a cc of 10,000 units strength heparin into a vial containing 30 cc's of normal saline. A portion of this was then drawn into the syringe by Carlin and used to fill the catheter so that no air entered the infant's artery and to coat the inside wall of the catheter. She then took a different syringe, drew the heparin solution into it to coat the main walls of the instrument and emptied it. Carlin then drew blood samples for the laboratory tests. About one-half of the one cc vial was used for this total process. Horine's testimony was 5,000 units of the available 10,000 units were used in the I.V. flush and heparinizing the syringe. She denied the child received 5,000 units though the medical record appears to indicate that. She testified the medical record did not accurately report the details of her procedure because she had been interrupted while filling it out and had not completed the entry.

Carlin checked the child's condition usually by personal visit at 2:15, 3, 4:30, 7:15 and 10:30 p.m. of the baby's birthdate. Due to some blood oozing from the umbilicus, that area was redressed and resutured. The child was not hemorrhaging and Carlin ordered routine feedings and more blood gas tests, including a 10:30 blood sample from the heel which did not have any oozing aftermath. The baby's hematocrit blood test had improved by 11 p.m. On the next morning, April 10, the infant developed some abdominal and leg swelling, showed evidence of some gastrointestinal bleeding, had seizures and her condition generally worsened. By early afternoon on the 10th, Carlin considered the baby possibly was bleeding within her head as a result of the prebirth insult and lack of oxygen. Alan Shumacher, M.D., assistant director of Children's Hospital, was consulted and given the case history. A spinal tap given by Carlin confirmed there was intracranial bleeding and the child was moved to Children's Hospital at 4 p.m. Morton Cohen, M.D., who picked up the child for delivery to Children's Hospital, had been told by Shumacher the child had been given an overdose of heparin and, after a review of the child's record and his own tests, concluded there had in fact been an overdose. He viewed the seizures as resulting from blood seepage in the brain due to ruptured blood vessels. He said the child's birth, not the heparin, would have caused the blood vessels to rupture.

At 6:30 p.m. on the 10th, Cohen administered protamine sulphate, which is to counteract the effect of heparin. This medication acts rapidly. Nevertheless, bloody fluid came from the brain in taps taken at 10:45 p.m. on the 10th, and other taps on the 11th, 12th, 13th and

14th. The child's red cell count had returned to a normal range by 7 a.m. on the 13th.

The child stayed in Children's Hospital for about a month and the Vecchiones were allowed to take the child home, having been taught how to drain the blood that accumulated under the soft tissue of the head. The child was an outpatient for about five months. She was then taken back to the hospital because the "shunt" which was used to draw the blood from the head had closed off. A larger shunt was made by surgery after about a month; the child was again taken home. Just before the first birthday, she was taken back to the hospital because the second shunt had closed. No surgery was scheduled and the child was moved to a children's convalescent facility where she suffered cardiac arrest and remained comatose until her death on February 25, 1978.

Although it is undisputed the birth was not normal and the child suffered distress before birth, the evidence was conflicting as to the exact cause of death. The central factual issue at the trial was whether the intracranial bleeding by Diana Vecchione was the result of overheparinization which would, of course, be the result of negligence, or the result of intrauterine problems during pregnancy. Substantial evidence supports the verdict favoring the defendants.

Cohen, a neonatologist, testifying for the Vecchiones stated in his opinion Diana was given an overdose of heparin which either caused the intracranial bleeding or made minor bleeding much worse. He said blood clotting studies he conducted at Children's Hospital ruled out the probability of disseminated intravascular coagulation (DIC).[2] Marguerite Markarian, M.D., a neonatologist, called by the defense, stated, however, in her opinion the studies at Children's Hospital were inconclusive and, in light of Mrs. Vecchione's placenta abruption some of that material entered the baby's circulation and caused DIC which, in turn, produced secondary bleeding. She testified DIC is an intravascular disease of abnormal blood coagulation not uncommon in newborn children. Blood tests to prove presence of heparin in the blood stream could have been made but were not. She stated in her opinion there was no evidence here the child suffered from overheparinization. In addition, she noted, had the infant been overheparinized, she would have metabolized the substance in three or four hours, assuming a nor-

---

[2]Widely scattered process of the blood changing from a liquid into a semisolid mass (i.e., clotting) within the arteries and veins.

mal liver function as was this child's, and there would not have been this type of bleeding without some trauma. Louis Gluck, M.D., professor of pediatrics and reproductive medicine at the University of California, San Diego, also called by the defense, confirmed the diagnosis the child suffered from DIC and was not overheparinized. Cecil Hougie, M.D., a hematologist, opined for the defense the tests performed at Children's Hospital did not provide reliable evidence of an overdose of heparin.

■ Vecchiones contend the trial court committed prejudicial error by refusing to instruct the jury in accordance with BAJI No. 14.65, which reads as follows: "A person who has a condition or disability at the time of an injury is not entitled to recover damages therefor. However, he is entitled to recover damages for any aggravation of such pre-existing condition or disability proximately resulting from the injury.

"This is true even if the person's condition or disability made him more susceptible to the possibility of ill effects than a normally healthy person would have been, and even if a normally healthy person probably would not have suffered any substantial injury.

"Where a pre-existing condition or disability is so aggravated, the damages as to such condition or disability are limited to the additional injury caused by the aggravation."

The court did not err in refusing to give that instruction.

■ A cause of action for wrongful death is a creation of the Legislature and exists in favor of the heirs for the wrongful death and the damages they suffer therefrom (Code Civ. Proc., § 377; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 891 et seq., p. 3180 et seq.). This differs from the injuries which the decedent might have claimed but which are not compensable in this type of action (*Parsons* v. *Easton* (1921) 184 Cal. 764, 770 [195 P. 419]). The cause of action lies for causing the death and the day of the decedent's death is the earliest day from which a cause of action for wrongful death can run (Code Civ. Proc., § 340, subd. 3; *Frederick* v. *Calbio Pharmaceuticals* (1979) 89 Cal.App.3d 49, 54-55 [152 Cal.Rptr. 292]). Damages for wrongful death occur as of that date and not before (see Rest.2d Torts, § 925, com. i, p. 531). ■ Damages recoverable include (1) the present value of future contributions; (2) the value of personal service, advice

or timing that would probably have been given; and (3) the value of the deceased's society and companionship (see *Krouse* v. *Graham* (1977) 19 Cal.3d 59, 67-70 [137 Cal.Rptr. 863, 562 P.2d 1022]; and see generally, 4 Witkin, Summary of Cal. Law (8th ed., 1974) Torts, § 891, p. 3180). Aggravation of a preexisting condition is not compensable in a wrongful death action (cf., *Smith* v. *Schumacker* (1938) 30 Cal.App.2d 251, 263 [85 P.2d 967], allowing recovery in a personal injury claim).

█ The Vecchiones contend the instruction was essential to properly state the theory of their claim as it relates to causation. The instruction, however, does not speak specifically to causation but, rather, to damages and would have been misleading. It would have the jury believe the aggravation is compensable though it was not the cause of death. BAJI No. 14.65 is proper only where the injured is the claimant seeking compensation for his injuries. That is not the case here in a wrongful death action. The court instructed the jury as to the necessity of proving causation (BAJI No. 2.60), provided a definition of proximate cause (BAJI No. 3.75) and explained the liability where there are concurring causes (BAJI No. 3.77). Instructions were given on the duty of a treating physician and surgeon, specialist, hospital and nurse (BAJI Nos. 6.00, 6.01, 6.20 and 6.25). We believe those instructions properly covered causation and adequately covered Vecchione's theory of recovery under the applicable law.[3]

█ The Vecchiones next contend it was error to refuse to instruct on the law of concurring causes as contained in BAJI No. 3.78. That instruction reads as follows: "Where two causes combine to bring about an injury and either one of them operating alone would have been sufficient to cause the injury, either cause is considered to be a [proximate][legal] cause of the injury if it is a material element and a substantial factor in bringing it about, even though the result would have occurred without it."

The instruction is proper where there are two or more causes of the injury or death complained of. As noted in BAJI: "This instruction is designed to be used and only should be given in such rare cases as suggested by Thomsen v. Rexall Drug & Chemical Co., 235 Cal.App. 2d 775,...where the injury would have resulted from either of two causes thus making inapplicable the 'but for' rule of proximate cause as

---

[3]Reliance on *Ng* v. *Hudson* (1977) 75 Cal.App.3d 250 [142 Cal.Rptr. 69], is misplaced. That was an action for personal injuries, not wrongful death, where aggravation is an element of damages and refusal to give the instruction was error.

stated in Instruction 3.75. If this instruction is given do *not* give Instruction 3.75."

*Thomsen* v. *Rexall Drug & Chemical Co.* (1965) 235 Cal.App.2d 775 [45 Cal.Rptr. 642], involved a situation where the plaintiff received and used an erroneously filled prescription and the court held the pharmacist could not be absolved from responsibility on the ground the identical harm would have been suffered without his error because the same injury would have also resulted from the massive doses of cortisone plaintiff had taken.

The "but for" rule, long a rule of finding causation in this state, serves well to define what is legal causation but fails in the type of situation where several causes concur to bring about an event and either one of them operating alone could have been sufficient to cause the result (*Thomsen* v. *Rexall Drug & Chemical Co., supra*, 235 Cal.App.2d 775). ▪ In those few situations, where there are concurrent causes, our law provides one cannot escape responsibility for his negligence on the ground that identical harm would have occurred without it. The proper rule for such situations is that the defendant's conduct is a cause of the event because it is a material element and a substantial factor in bringing it about (*Thomsen, supra*, at p. 783; Prosser, Law of Torts (4th ed. 1971) § 41, pp. 239, 240). This does not suggest the instruction is appropriate whenever there are possible concurrent causes. *Thomsen* deals with a limited situation where the defendant asserts the facts indicate the injury would have resulted in any event from another's acts. ▪ Here there was substantial dispute between the parties but each contends there was a single cause for the death—either the prenatal distress resulting in DIC was the cause of death or the overheparinization brought it about. The plaintiffs' expert specifically put the cause as overheparinization and ruled out DIC as a cause, though he was willing to admit DIC could have been present. The defendants' experts, on the other hand, contended the cause was DIC and there was no heparin overdose. Under these circumstances, the "but for" test is not improper. This is not a case of two causes, either of which alone would have been sufficient to bring about the same result; the jury was asked to decide which *one* caused the death and a *Thomsen* instruction was not proper.

As noted above, that the doctor and nurse could have been concurring causes was not overlooked. The court did give a general instruction on concurring cause, thus covering this aspect of this case (BAJI No. 3.77).

■ Finally, the Vecchiones contend the court erred in refusing to give the instruction which applies when the precise cause cannot be identified as specified in BAJI No. 3.80. The proffered instruction reads: "If the plaintiff establishes by a preponderance of the evidence all of the facts necessary to prove (1) that each of the defendants was negligent, and (2) that the negligent act of one of the defendants was a [proximate][legal] cause of plaintiff's injury, and (3) that the injury was such that it could only result from the negligent act of one of the defendants, and (4) that from the circumstances of the accident the plaintiff cannot reasonably establish which defendant's negligence was the [proximate][legal] cause of the injury, then you will find that each defendant is liable for plaintiff's injury.

"However, under such circumstances, a defendant is not liable if he establishes by a preponderance of the evidence all of the facts necessary to prove that his negligence was not a [proximate] [legal] cause of plaintiff's injury."

The instruction is not proper where there is substantial evidence the cause of death was unrelated to the negligence, if any, of the defendants.

This instruction would have been appropriate if there was undisputed evidence of overheparinization, the only question being who was responsible, i.e., the doctor for administering the drug or the nurse for preparing it. The burden of going forward to prove which of the two was the sole cause of the harm would shift to the defendants. As stated in *Summers* v. *Tice* (1948) 33 Cal.2d 80, at pages 85 to 86 [199 P.2d 1, 5 A.L.R.2d 91]: "'When two or more persons by their acts are possibly the sole cause of a harm, or when two or more acts of the same person are possibly the sole cause, and the plaintiff has introduced evidence that the one of the two persons, or the one of the same person's two acts, is culpable, then the defendant has the burden of proving that the other person, or his other act, was the sole cause of the harm. (b) . . . The real reason for the rule that each joint tortfeasor is responsible for the whole damage is the practical unfairness of denying the injured person redress simply because he cannot prove how much damage each did, when it is certain that between them they did all; let them be the ones to apportion it among themselves. Since, then, the difficulty of proof is the reason, the rule should apply whenever the harm has plural causes, and not merely when they acted in conscious concert. . . .' (Wigmore, Select Cases on the Law of Torts, § 153.)" Under the evi-

dence here, however, the defendants were not the solely responsible cause. The abruptio placentae was also a real factor in the cause of Diana's death and could have been, and by the jury's verdict presumably was, the cause of developing DIC and resulting death. If that is the cause, it is not attributable to defendant's alleged negligence. As noted above, the issues were clearly defined in the area of causation and to suggest a shifting in the burden of proof in this case would have been confusing to the jury and improper. The court did instruct the jury there could be more than one proximate cause of the injury and, when the negligent conduct of two or more persons contributes concurrently as causes of an injury, the conduct of each is a proximate cause. This adequately defines the factual question to be resolved and the resulting liability between the doctor and the hospital (nurse). Prerequisite to application of this rule was determination of the question there was either overheparinization or there was not. The jury resolved the issue using the proper burden of proof. There was no error.

Judgment affirmed.

Brown, (Gerald), P. J., and Work, J. concurred.