[No. B035667. Second Dist., Div. One. July 27, 1989.]

BRENNAN SIMMONS, a Minor, etc., et al., Plaintiffs and Appellants, v.
WEST COVINA MEDICAL CLINIC et al., Defendants and Respondents.

698

### COUNSEL

Adel & Pollack and Nancy P. Adel for Plaintiffs and Appellants.

Ian Herzog, Richard D. Aldrich, Leonard Sacks, Harvey R. Levine, Gary Gwilliam, Robert Steinberg, Douglas DeVries, Sanford Gage, Bruce Broillett and Roland Wrinkle as Amici Curiae on behalf of Plaintiffs and Appellants.

Hagenbaugh & Murphy, Mary E. Porter and John R. Lisenbery for Defendants and Respondents.

Horvitz & Levy, Ellis J. Horvitz, David M. Axelrad, Barry R. Levy and M. Reed Hunter as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**ORTEGA, J.**—In this case, we conclude plaintiffs mother and child have failed to establish their respective causes of action for wrongful birth and wrongful life. Even if the defendant physician had provided the expectant mother with a certain genetic test, the test's 20 percent probability of detecting the risk of Down's Syndrome falls far short of the requisite reasonable medical probability standard of causation. We affirm the summary judgment for defendants.

### FACTS

Defendant Suneetha Ali, M.D., cared for plaintiff Brenda Simmons during her pregnancy at defendant West Covina Medical Clinic. On September 29, 1986, Brenda Simmons gave birth to plaintiff Brennan Simmons, who is afflicted with Down's Syndrome. Plaintiffs filed this action against defendants for negligence, wrongful birth, and wrongful life on June 15, 1987.[1]

According to the allegations of the operative pleading, defendants negligently failed to provide Brenda Simmons with appropriate genetic testing and counseling, thus denying her the opportunity to discover the genetic defect in her unborn child. Had she learned of the abnormality, she would have terminated the pregnancy.

Following preliminary procedural matters, defendants moved for summary judgment, contending plaintiffs as a matter of law cannot prove defendants' negligence caused the harm. For the purpose of their motion only, defendants conceded they were negligent in failing to advise Brenda Simmons concerning the genetic test known as the maternal serum Alpha Fetoprotein test (AFP test). However, defendants argued their negligence did not proximately cause Brennan Simmons to be born, because the AFP

---

[1] Brennan Simmons, a minor, brings his cause of action for wrongful life by and through his mother and guardian ad litem, Brenda Simmons, who also brings her own cause of action for wrongful birth. The terms "wrongful life" for actions by the child and "wrongful birth" for actions by the parents have been adopted by the California Supreme Court. (*Turpin* v. *Sortini* (1982) 31 Cal.3d 220, 225, fn. 4 [182 Cal.Rptr. 337, 643 P.2d 954].)

test provides only a 20 percent probability of detecting the risk of Down's Syndrome.

The record contains the following uncontroverted evidence concerning the AFP test. Section 6527 of chapter 17 of the California Code of Regulations, enacted in April 1986 pursuant to section 289.7 of the Health and Safety Code, requires clinicians to advise all pregnant women in their care of the availability of the AFP test for "pre-natal screening of neural tube defects of the fetus." This information must be given at the woman's first prenatal visit, provided she is within the first 20 weeks of gestation. The AFP test, which involves taking the woman's blood sample, is performed on a voluntary basis between the 16th and 20th week of gestation.

In 1979, when the Legislature directed the Department of Health Services to develop AFP test regulations, the test was known to identify fetal neural tube defects such as spina bifida and anencephaly. It was only later, in 1984, that a possible association was reported between low maternal serum AFP and Down's Syndrome. Approximately 20 percent of pregnant women under the age of 35 who are at risk with respect to Down's Syndrome will be identified through the test. However, about 80 percent of women in that age group who are at risk will not be identified through the AFP test.

When the AFP test discloses a risk of Down's Syndrome, the pregnant woman is referred for a second test, known as an amniocentesis test. This involves the withdrawal and testing of amniotic fluid from the sac in which the unborn child rests in the mother, and carries a higher risk of injury to the mother and fetus than does the AFP test. Currently, pregnant women under the age of 35 are not routinely given the amniocentesis test. Accordingly, for these women, the AFP test is the only commonly used method to identify the risk of Down's Syndrome.

The trial court granted defendants' motion for summary judgment, finding defendants did not proximately cause the harm since there was a less than 50 percent chance the AFP test would have detected the risk of Down's Syndrome. Plaintiffs appeal from the summary judgment.

## ISSUES

We must decide whether (1) defendants have demonstrated as a matter of law that they did not proximately cause the harm because even with an AFP test there was no reasonable medical probability of discovering the risk of Down's Syndrome, and (2) whether plaintiffs should nevertheless be compensated for losing their less than even chance of avoiding the harm.

DISCUSSION

1. *Causation*

■ Summary judgment, a drastic procedure which denies the adverse party the right to a trial on the merits, should be granted with caution. (*Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 35 [210 Cal.Rptr. 762, 694 P.2d 1134].) Summary judgment should only be granted when the evidence in support of the moving party establishes that there is no issue of fact to be tried. (Code Civ. Proc., § 437c.) ■ The moving party bears the burden of furnishing supporting documents to establish the adverse party's claims lack merit under any legal theory. (*Lipson* v. *Superior Court* (1982) 31 Cal.3d 362, 374 [182 Cal.Rptr. 629, 644 P.2d 822].) The court will strictly construe the moving party's affidavits, while liberally construing those of the adverse party. (*Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].) ■ Any doubt concerning the propriety of granting the motion should be resolved in favor of the adverse party. (*Ibid.*)

■ California recognizes a parent's cause of action for the wrongful birth of a genetically deformed child where the physician negligently failed to inform the parent of the risk of bearing such a child. (*Turpin* v. *Sortini, supra,* 31 Cal.3d at pp. 225, 239.) California also recognizes a cause of action for wrongful life by the genetically deformed child. (*Ibid.*) But in most jurisdictions, recovery by the genetically deformed child "has been uniformly denied on the dual grounds that (a) a legal remedy contradicts the fundamental belief that human life has value, and (b) measuring damages by comparison of an impaired life with nonexistence is impossible. [Citations.]" (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 797, p. 143.)

■ In a successful wrongful birth and wrongful life action, the parents may recover for medical and extraordinary teaching and training expenses incurred during the child's minority, but the child may not also recover for those same expenses. (*Turpin* v. *Sortini, supra,* 31 Cal.3d at p. 238.) The child may recover medical expenses and special damages where the parents are unavailable to sue or where the expenses are incurred beyond the time of the parents' legal responsibility for such care. (*Ibid.*) However, the child may not recover for pain and suffering and other general damages (*id.* at pp. 238-239), such as loss of earning capacity (*Andalon* v. *Superior Court* (1984) 162 Cal.App.3d 600, 614 [208 Cal.Rptr. 899]).

■ As in ordinary medical malpractice cases, the plaintiffs in a wrongful life and wrongful birth case must establish the following basic elements:

"(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." (*Budd* v. *Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433]; *Turpin* v. *Sortini, supra,* 31 Cal.3d at pp. 229-230.) The sole element at issue here is that of proximate cause.

Under the above described principles in California, plaintiffs cannot recover where there is only a mere possibility the defendant's negligence caused the wrong. (*Jones* v. *Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402-403 [209 Cal.Rptr. 456]; *Morgenroth* v. *Pacific Medical Center, Inc.* (1976) 54 Cal.App.3d 521, 533 [126 Cal.Rptr. 681].) ▮ In this case, the undisputed evidence shows the AFP test would have provided only a 20 percent chance of uncovering Brenda Simmons's risk of giving birth to a child with Down's Syndrome. Defendants contend there is thus no "reasonable medical probability based upon competent expert testimony" (*Jones* v. *Ortho Pharmaceutical Corp., supra,* 163 Cal.App.3d at p. 402), that their failure to provide the AFP test deprived Brenda Simmons of the opportunity to terminate her pregnancy. We agree.

▮ As stated in *Jones* v. *Ortho Pharmaceutical Corp., supra,* 163 Cal.App.3d 396, there exists an obvious distinction between a reasonable medical probability and a medical possibility. (*Id.* at p. 403.) There can be many, even an infinite number of, possible circumstances which can produce an injury. But a "possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. This is the outer limit of inference upon which an issue may be submitted to the jury. [Citation.]" (*Ibid.*)

▮ The undisputed evidence in this case demonstrates a significantly less than 50 percent chance of predicting the outcome of the pregnancy. Unlike *Curlender* v. *Bio-Science Laboratories* (1980) 106 Cal.App.3d 811 [165 Cal.Rptr. 477], where a properly performed genetic test would have provided a "high probability" (*id.* at p. 815) of disclosing the risk of Tay-Sachs disease, the AFP test in this case would have provided only a 20 percent chance of disclosing the risk of Down's Syndrome.

A mere 20 percent chance does not establish a "reasonably probable causal connection" (*Jones* v. *Ortho Pharmaceutical Corp., supra,* 163 Cal.App.3d at p. 403) between defendants' negligent failure to provide the AFP test and plaintiffs' injuries. A less than 50-50 possibility that

defendants' omission caused the harm does not meet the requisite reasonable medical probability test of proximate cause. (*Id.* at p. 404.)

Plaintiffs alternatively argue a triable issue of fact exists under the doctrine enunciated in *Haft* v. *Lone Palm Hotel* (1970) 3 Cal.3d 756 [91 Cal.Rptr. 745, 478 P.2d 465]. In *Haft,* a father and son drowned in a motel pool, where, in violation of state law, no lifeguard or warning sign had been provided. No witnesses observed the drownings. Recognizing the motel's failure to provide a lifeguard made it impossible for the plaintiffs to prove the cause of the accident, the *Haft* court shifted the burden of proof to the defendants to prove the drownings would have occurred even if a lifeguard had been provided. The *Haft* court stated: "[T]he shift of the burden of proof . . . may be said to rest on a policy judgment that when there is a *substantial probability* that a defendant's negligence was a cause of an accident and when the defendant's negligence makes it impossible, as a practical matter, for plaintiff to prove 'proximate causation' conclusively, it is more appropriate to hold the defendant liable than to deny an innocent plaintiff recovery, unless the defendant can prove that his negligence was not a cause of the injury." (*Id.* at p. 774, fn. 19, italics added.)

Relying on *Haft,* plaintiffs maintain defendants violated state laws and regulations governing the AFP testing program implemented to detect birth defects. But the chance of avoiding the harm by complying with the statute in *Haft* was dramatically higher than in this case. In *Haft,* a "reasonably attentive lifeguard would without doubt have been aware of [the victims'] activities at the moment that the instant emergency arose." (*Haft* v. *Lone Palm Hotel, supra,* 3 Cal.3d at p. 772, fn. 18.) Moreover, in *Haft* the chances of successful rescue were "very high" (*ibid.*), such that the court noted the plaintiffs "may well succeed in[ ] establishing that the absence of a lifeguard was an actual cause of the deaths as a matter of law even without a shift in the burden of proof [citations]." (*Ibid.*)

Here, on the other hand, the undisputed facts show the AFP test would have provided only a slim, 20 percent chance of detecting the harm. As in *Jones* v. *Ortho Pharmaceutical Corp., supra,* 163 Cal.App.3d 396, plaintiffs here would have us ignore the fact that in *Haft* there was a reasonable probability the presence of a lifeguard would have prevented the drownings. (*Id.* at pp. 405-406.) We cannot retroactively presume from defendants' failure to comply with state AFP testing statutes and regulations that there was a reasonable degree of medical probability the test would have detected Down's Syndrome in this case. (*Ibid.*)

In view of the undisputed evidence of plaintiffs' low probability of avoiding the harm even with the AFP test, we decline to shift the burden of proof

on the ground defendants' failure to comply with the statutes and regulations made it impossible for plaintiffs to prove causation. Given the absence of any "reasonable medical probability based upon competent expert testimony" (*Jones v. Ortho Pharmaceutical Corp., supra,* 163 Cal.App.3d at p. 402) that defendants' failure to provide the AFP test deprived Brenda Simmons of the opportunity to terminate her pregnancy, we conclude defendants have successfully demonstrated as a matter of law that their conduct did not proximately cause the harm.

## 2. *Lost Chance Theory of Recovery*

■ Plaintiffs contend their low statistical probability of avoiding the harm should not prevent them from recovering damages for their lost chance of terminating the pregnancy. Plaintiffs assert a jury could consider their low statistical probability of avoiding the harm, but only for the purpose of calculating damages. They assert it is unfair and unjust to apply the traditional medical probability test of causation to cases such as this, where the compensable injury is a lost chance rather than a tangible physical injury.

Both the parties and amici curiae have filed extensive briefs discussing numerous cases in foreign jurisdictions which have adopted the lost chance theory of recovery in medical malpractice cases where the defendants' negligence deprived the plaintiffs of a less than even chance of survival. (See, e.g., *Waffen v. U.S. Dept. of Health & Human Services* (4th Cir. 1986) 799 F.2d 911; *DeBurkarte v. Louvar* (Iowa 1986) 393 N.W.2d 131; *Herskovits v. Group Health Co-op.* (1983) 99 Wn.2d 609 [664 P.2d 474], conc. opn. of Pearson, J.;[2] for an informative discussion, see King, *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences* (1981) 90 Yale L.J. 1353; Note, *Medical Malpractice: The Right to Recover for the Loss of a Chance of Survival* (1985) 12 Pepperdine L.Rev. 973; Annot., Medical Malpractice: "Loss of Chance" Causality (1987) 54 A.L.R.4th 10.) However, none of the cases identified by the parties involve the application of the lost chance doctrine in a wrongful birth and wrongful life case such as this.

Many of the lost chance cases rely on the following language contained in section 323 of the Restatement Second of Torts (1965): "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from

---

[2] The "majority" opinion in *Herskovits* has but two signatories, while the "concurring" opinion has four. The two dissenting opinions have three signatories between them. Thus, Justice Pearson's concurring opinion represents the plurality view.

his failure to exercise reasonable care to perform his undertaking, if [¶] (a) his failure to exercise such care increases the risk of such harm . . . ." (See *Hamil* v. *Bashline* (1978) 481 Pa. 256 [392 A.2d 1280]; *Thompson* v. *Sun City Community Hosp., Inc.* (1984) 141 Ariz. 597 [688 P.2d 605].) Many of the jurisdictions that adopted section 323 also require the jury to decide whether the increased risk was a substantial factor in causing the ultimate harm. (See, e.g., *McKellips* v. *Saint Francis Hosp., Inc.* (Okla. 1987) 741 P.2d 467; *Hamil* v. *Bashline, supra,* 481 Pa. 256; *Evers* v. *Dollinger* (1984) 95 N.J. 399 [471 A.2d 405].)[3]

But we perceive a fundamental distinction between negligently reducing a patient's chance of survival and negligently depriving a woman of the chance to abort a genetically defective child. In the former situation, the patient's condition may be attributable to a host of factors in addition to the physician's negligence. Thus some courts have recognized that the difficulties of identifying, defining and proving injury in these types of medical malpractice cases justify the application of a more flexible standard of causation. (See *Evers* v. *Dollinger, supra,* 95 N.J. 399; *Hamil* v. *Bashline, supra,* 481 Pa. 256.) But in the case of a genetically deformed child, it cannot be said that the hereditary condition was caused by the medical practitioner's negligence when no degree of medical intervention could have worked a cure. And where, as here, the probability of predicting the genetic defect is only 20 percent, we think established tort principles fairly impose liability only where there is a reasonable medical probability of predicting the outcome of the pregnancy.

It is interesting to note that at least three of the jurisdictions that recognize a lost-chance theory of recovery in medical malpractice cases do not permit a child, for reasons of public policy, to recover for wrongful life. (*Berman* v. *Allan* (1979) 80 N.J. 421 [404 A.2d 8]; *Becker* v. *Schwartz* (1978) 46 N.Y.2d 401 [413 N.Y.S.2d 895, 386 N.E.2d 807]; *Speck* v. *Finegold* (1979) 268 Pa.Super. 342 [408 A.2d 496].) This dichotomy illustrates both the tremendous difficulty in weighing the value of an impaired life as opposed to nonexistence, and the many philosophically different ways in which society views those two conditions.

Under the facts of this case, we decline to establish a more lenient standard of causation. To do so would be contrary to sound logic, legal

---

[3] This line of reasoning apparently arose from the following dicta in *Hicks* v. *United States* (4th Cir. 1966) 368 F.2d 626: "When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable." (*Id*. at p. 632; see, e.g., *Thompson* v. *Sun City Community Hosp. Inc., supra,* 141 Ariz. 597 [688 P.2d 605]; *O'Brien* v. *Stover* (8th Cir. 1971) 443 F.2d 1013; *Jeanes* v. *Milner* (8th Cir. 1970) 428 F.2d 598.)

precedent, and public policy. It would unwisely encourage costly and unreasonable overtesting and overtreatment for defensive purposes. Physicians would find it necessary to place the requirements of the legal system before the needs and the finances of the patient. In addition, the physicians' increased exposure to liability would adversely impact already high medical malpractice premiums, resulting in an upward spiral of consumer costs. The uncertainty fostered by such a ruling would undoubtedly open the proverbial floodgates of our overburdened judicial system.

We refuse to expand the circle of liability by abandoning established tort law principles of causation where there is only a mere possibility of detecting the genetic defect. We do not wish to intrude upon the Legislature's task of weighing such matters of public policy, and leave to it the function of deciding whether to provide a remedy for those genetically defective children and their parents who are unable to prove to a reasonable medical certainty that medical negligence deprived the mother of the chance to terminate her pregnancy.

## DISPOSITION

We affirm the summary judgment. Each party is to bear its own costs on appeal.

Hanson (Thaxton), J., concurred.

**SPENCER, P. J.**—I respectfully dissent. I would hold that the "lost opportunity" doctrine applies to a case of this nature.

In my view, the line of medical malpractice cases dealing with a patient's lost opportunity for long-term survival of or recovery from a disease or condition provides a close analogy. In the majority of jurisdictions which have considered the question, the courts permit recovery for such a lost opportunity. Essentially, these cases employ one of three rationales.

The courts in some jurisdictions view the lost opportunity itself as the compensable injury for which a negligent defendant is liable, thus avoiding difficulties in proving causation where the chance of survival or recovery in the first instance is 50 percent or less. These courts often rely in significant part on the thoughtful analysis of King, *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences* (1981) 90 Yale L.J. 1353. (See, e.g., *Waffen v. U.S. Dept. of Health & Human Services* (4th Cir. 1986) 799 F.2d 911, 918-919; *Hetrick v. Weimer* (1986) 67 Md.App. 522 [508 A.2d 522, 531]; *DeBurkarte v. Louvar* (Iowa 1986) 393 N.W.2d 131, 135-138; *Herskovits v. Group Health Co-op.* (1983)

99 Wn.2d 609 [664 P.2d 474, 486], conc. opn. of Pearson, J.; see also *James v. United States* (N.D.Cal. 1980) 483 F.Supp. 581, 587; *Jordan v. Bero* (1974) 158 W.Va. 28 [210 S.E.2d 618, 640-641], conc. opn., Neely, J.)

Although California courts have not as yet wrestled with this issue directly, *James v. United States, supra,* 483 F.Supp. 581, does apply California law to a federal tort claim. *James* predates and thus does not rely on the King article, but is to a degree a precursor of it, stating liability will attach where the evidence shows a defendant's conduct placed a plaintiff in a position worse than that in which the plaintiff otherwise would have been. (At p. 585.) There is a sound public policy basis for adopting the expanded version of this analysis so thoughtfully articulated by King, i.e., viewing the degree to which a plaintiff's position has been worsened as the compensable injury in cases where a patient's health or longevity has been impaired by a defendant's negligence. As embodied in part in the wrongful death statutes, our society places a singularly high value on one's right to live out one's natural life span in the greatest degree of health that freedom from the wrongdoing of others permits.

The second rationale upon which the "lost opportunity of survival" cases rely draws an analogy to "failure to rescue" cases, in particular *Gardner v. National Bulk Carriers, Inc.* (4th Cir. 1962) 310 F.2d 284, certiorari denied (1963) 372 U.S. 913 [9 L.Ed.2d 721, 83 S.Ct. 728]. *Gardner* notes the duty to rescue "arises when there is a reasonable *possibility* of rescue." (At p. 287, italics added.) When there has been no attempt to rescue, it cannot be determined with any degree of certainty—or even probability—whether the attempt would have saved the victim's life. Therefore, "causation is proved if the [defendant's] omission destroys the reasonable possibility of rescue. [That is,] proximate cause here is implicit in the breach of duty. Indeed, the duty would be empty if it did not itself embrace the loss as a consequence of its breach. Once the evidence sustains the reasonable possibility of rescue, ample or narrow, according to the circumstances, total disregard of duty, refusal to make even a try, as was the case here, imposes liability." (*Ibid.*; see also *Zinnel v. United States Shipping Board E. F. Corporation* (2d Cir. 1925) 10 F.2d 47, 49.)

In the context of medical malpractice "lost opportunity of survival" cases, the "failure to rescue" analogy first was employed in dicta in *Hicks v. United States* (4th Cir. 1966) 368 F.2d 626. *Hicks* notes: "When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial *possibility* of survival and the defendant has destroyed it, he is answerable." (At p. 632, italics added.)

Other courts have adopted the *Hicks* rationale. (See, e.g., *Mays* v. *United States* (D.C.Colo. 1985) 608 F.Supp. 1476, 1480-1481; *Aasheim* v. *Humberger* (1985) 215 Mont. 127 [695 P.2d 824, 828]; *Thompson* v. *Sun City Community Hosp., Inc.* (1984) 141 Ariz. 597 [688 P.2d 605, 616]; *Roberson* v. *Counselman* (1984) 235 Kan. 1006 [686 P.2d 149]; *O'Brien* v. *Stover* (8th Cir. 1971) 443 F.2d 1013, 1018-1019; *Jeanes* v. *Milner* (8th Cir. 1970) 428 F.2d 598, 604-605.) In essence, these cases reformulate the duty owed, then look to the consequences of its breach in ascertaining the compensable injury.

A lost opportunity of survival or recovery reasonably may be viewed as analogous to a lost opportunity of rescue, for the medical practitioner may be considered, in effect, to undertake the attempted "rescue" of the patient from a specific disease or condition. However, the analogy is more strained than the relatively straightforward approach of directly viewing the lost opportunity as the compensable injury.

The third rationale employed in the "lost opportunity of survival" cases is derived from Restatement Second of Torts section 323, subdivision (a), which provides in pertinent part: "One who undertakes . . . to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if [¶] (a) his failure to exercise such care increases the risk of such harm." California expressly recognizes this principle of tort liability. (See *Williams* v. *State of California* (1983) 34 Cal.3d 18, 23[192 Cal Rptr. 233, 664 P.2d 137]; *Heckmann* v. *Ahmanson* (1985) 168 Cal.App.3d 119, 132 [214 Cal.Rptr. 177].)

The jurisdictions that rely on this principle to permit recovery for a lost opportunity of survival or recovery recognize the ultimate harm suffered (death or incomplete recovery) as the compensable injury and the underlying disease or condition as *a* cause of that injury. However, they also recognize that the medical practitioner has undertaken to protect the patient from this very injury through prompt and accurate diagnosis, as well as effective treatment. Hence, a failure to exercise due care in the undertaking also is *a* cause of the ultimate harm, in that the medical practitioner has, through his or her negligence, *increased the risk* of harm. (*McKellips* v. *Saint Francis Hosp., Inc.* (Okla. 1987) 741 P.2d 467, 471-473; *Herskovits* v. *Group Health Corp., supra,* 664 P.2d at pp. 476-477.) This is consistent with the traditional causation analysis employed in California in the face of multiple causative factors. (Cf. *Vecchione* v. *Carlin* (1980) 111 Cal.App.3d 351, 359 [168 Cal.Rptr. 571].)

Recognizing the dual causative factors at work, these jurisdictions permit a case to go to the jury once a plaintiff has made a showing that the

defendant's negligence increased the risk of harm. Generally, the courts acknowledge, it is for the jury to determine whether that increase in risk is a substantial factor in causing the ultimate harm. (*McKellips* v. *Saint Francis Hosp., Inc., supra,* 741 P.2d at p. 475; *Evers* v. *Dollinger* (1984) 95 N.J. 399 [471 A.2d 405, 415]; *Gradel* v. *Inouye* (1980) 491 Pa. 534 [421 A.2d 674, 679]; see also *Jones* v. *Montefiore Hospital* (1981) 491 Pa. 410 [431 A.2d 920]; *Herskovits* v. *Group Health Co-op., supra,* 664 P.2d at pp. 476-477.) Thus, so long as reasonable minds may differ on whether a specific increased risk of harm was a substantial factor in bringing about the ultimate injury, causation is not a question which can be resolved on summary judgment.

There is no question in my mind but that the instant matter fits comfortably within the first two of the foregoing rationales. Clearly, defendants' negligence placed plaintiff Brenda Simmons in a position worse than that in which she otherwise would have been, depriving her entirely of *any* opportunity to learn information essential to her informed decision whether to continue her pregnancy. Similarly, there is evidence here which suggests there was a reasonable *possibility* of "rescuing" her from her ignorance; it may have been only a 20 percent possibility, but it existed and is at least sufficient to present a question for determination by the trier of fact.

In determining the extent, if any, to which the foregoing rationales should be applied to the instant matter the critical question is one of public policy: whether the interest at stake here is entitled to legal protection from negligence. (*Smith* v. *Superior Court* (1984) 151 Cal.App.3d 491, 496 [198 Cal.Rptr. 829].) California, like other states, affords considerable protection to a woman's right to make an informed decision whether to continue with a pregnancy. (*Foy* v. *Greenblott* (1983) 141 Cal.App.3d 1, 8 [190 Cal.Rptr. 84].) Hence, a breach of duty that deprives a woman of information which may be necessary to such a decision, or the reasonable *opportunity* to make that decision, results in liability. (*Turpin* v. *Sortini* (1982) 31 Cal.3d 220, 234 [182 Cal.Rptr. 337, 643 P.2d 954]; see also *Berman* v. *Allan* (1979) 80 N.J. 421 [404 A.2d 8, 14]; *Becker* v. *Schwartz* (1978) 46 N.Y.2d 401 [413 N.Y.S.2d 895, 306 N.E.2d 307].)

Some courts have been reluctant to say it is better that a fetus not be born at all than that it be born defective (see, e.g., *Berman* v. *Allan, supra,* 404 A.2d at pp. 12-13; *Speck* v. *Finegold* (1979) 268 Pa.Super. 342 [408 A.2d 496, 508]; *Becker* v. *Schwartz, supra,* 413 N.Y.S.2d at p. 900), limiting their concern to protecting the mother's, or parents', right to make the decision. However, it is becoming increasingly clear what a massive toll giving birth to a severely defective infant can take. In certain cases, the child is condemned to a brief and tortured existence. In many instances, whole families suffer grave damage or even destruction. Not all potential parents are

equally able to bear the anguish and emotional burden attendant upon the birth of a genetically damaged infant. Depending on the extent of the impairment, any emotional "benefit" derived from the child's existence may be significantly outweighed by the attendant anguish. (*Phillips* v. *United States* (D.S.C. 1983) 575 F.Supp. 1309, 1319-1320.)

This raises the question of whether the purpose of the Alpha Fetoprotein screening program is best served by permitting or denying recovery for failure to make it available in circumstances such as those presented here. Plaintiffs presented evidence that the test is important in part precisely because it provides the sole vehicle for detecting safely and at a modest cost pregnancies among younger women at a high risk for Down's Syndrome. This suggests the purposes of the testing program would not be served adequately if the plaintiffs are precluded from recovering damages in a case such as this one. Inasmuch as a physician already is required to make this test available routinely to all pregnant women (Health & Saf. Code, § 289.7; Cal. Code Regs., tit. 17, § 6527), permitting recovery clearly would not increase the burden of testing or result in unjustified overtesting; thus, it would not tend to increase medical costs.

Permitting recovery in these particular circumstances is essential to the protection of a woman's right to decide whether to continue a pregnancy. To hold otherwise is to subvert the deterrence function of tort law by preventing recovery "for the effects of conduct that may cause statistically irrefutable" injury. (*McKellips* v. *Saint Francis Hosp., Inc., supra,* 741 P.2d at p. 474.) To hold otherwise is to place "a segment of society often least able to exercise independent judgment" at the mercy of those professionals upon whom it must rely for vital prenatal care. (*Roberson* v. *Counselman, supra,* 686 P.2d at p. 160.) In other words, there is at stake here a significant interest entitled to legal protection from negligence. (*Smith* v. *Superior Court, supra,* 151 Cal.App.3d at p. 496.)

The majority attempts to distinguish the instant situation from that in which a diseased or injured patient loses a chance of survival or increased longevity. While it cannot be said the genetically defective condition was caused by the medical practitioner's negligence, it is equally true that he or she has not caused the initial disease or injury. This approach mistakes the nature of the interest to be protected and injury suffered. The real injury here is not the birth of a genetically damaged infant, but the compelled ignorance leading to that birth. In other words, in the circumstances present here, as well as those present in the "survival" cases, the medical negligence forces the patient unknowingly to assume additional risk.

Accordingly, I would adopt the rationale of such cases as *Waffen* v. *U.S. Dept. of Health & Human Services, supra,* 799 F.2d 911, *Hetrick* v. *Weimer,*

*supra,* 508 A.2d 522, and *DeBurkarte v. Louvar, supra,* 393 N.W.2d 131, to hold the compensable injury here is plaintiff Brenda Simmons's lost opportunity of acquiring that information which might have been essential to her informed decision whether to continue her pregnancy. This is a very real, "statistically irrefutable," injury (*McKellips v. Saint Francis Hosp., Inc., supra,* 741 P.2d at p. 474) worthy of compensation. "[T]hat a person is confronted with a ten percent, fifteen percent, or twenty percent probability (in the mathematical sense) that [she] will suffer future injuries should be sufficient to permit [her] to recover for those future injuries at least in proportion to the probability of such injuries occurring. . . . Once it is determined [to a medical certainty] that there is a probability of loss, evidence should then be admitted concerning the maximum expected loss should the victim completely lose in the game of chance [she] is playing with the fates." (*Jordan v. Bero, supra,* 210 S.E.2d at pp. 640-641, conc. opn. of Neely, J.) If the parental right to weigh and decide whether the tremendous burden of giving birth to a genetically impaired infant can be borne or whether, in a particular circumstance, it is better for the child as well that a pregnancy be terminated is to have any substance, any real value, the loss of such an opportunity must be viewed as an injury as grave as a lost opportunity for survival or recovery.

Since the evidence shows plaintiff Brenda Simmons originally to have had approximately a 20 percent chance of learning she was carrying a fetus afflicted with Down's Syndrome and further shows defendants' failure to make available to her Alpha Fetoprotein testing completely destroyed that opportunity, it is clear to me that plaintiffs have submitted sufficient evidence to raise a triable issue of material fact on the issue of causation. Accordingly, I would hold that the trial court erred in granting summary judgment.

Appellants' petition for review by the Supreme Court was denied November 16, 1989. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.