[No. B007847. Second Dist., Div. Seven. May 14, 1985.]

RICHARD J. HECKMANN et al., Plaintiffs and Respondents, v.
C. L. AHMANSON et al., Defendants;
SAUL P. STEINBERG et al., Defendants and Appellants.

Counsel

Wyman, Bautzer, Rothman, Kuchel & Silbert, Andrew White, McCutchen, Black, Verleger & Shea, Peter W. James, Willkie Farr & Gallagher, Anthony F. Phillips, Gerald Kerner, John Mark Rochefort and Blair C. Fensterstock for Defendants and Appellants.

Greenberg, Hennigan & Mercer, J. Michael Hennigan, Dana Carli Brooks, Dye, Thomas & Luebs, Donald H. Dye, William Thomas, Lovitt & Hannan and J. Thomas Hannan for Plaintiffs and Respondents.

Opinion

**JOHNSON, J.**—Plaintiffs, stockholders in Walt Disney Productions, are suing to recover the payoff in the greenmailing[1] of Disney. Defendants are the Disney directors who paid the greenmail and the "Steinberg Group"[2] to whom the money, approximately $325 million, was paid.

Plaintiffs obtained a preliminary injunction which, in effect, imposes a trust on the profit from the Disney-Steinberg transaction, approximately $60 million, and requires the Steinberg Group to render periodic accountings of the disposition of the entire proceeds. The Steinberg Group appeals from this preliminary injunction. We affirm.

As will be discussed more fully below, if plaintiffs prove the Steinberg Group breached a fiduciary duty to the corporation and its shareholders in the sale of stock to the corporation the plaintiffs would be entitled to a constructive trust upon the profits of that sale. Plaintiffs have established a reasonable probability of proving breach of fiduciary duties by the Steinberg Group. The trial court could reasonably conclude from the evidence a preliminary injunction was necessary to prevent the dissipation or disappearance of the profit during the pendency of the action and the balance of

---

[1] A greenmailer creates the threat of a corporate takeover by purchasing a significant amount of the company's stock. He then sells the shares back to the company at a premium when its executives, in fear of their jobs, agree to buy him out. For further discussion of greenmail see, Lowenstein, *Pruning Deadwood In Hostile Takeovers: A Proposal For Legislation* (1983) 83 Colum. L.Rev. 249, 311 & fn. 249; Greene & Junewicz, *A Reappraisal Of Current Regulation Of Mergers And Acquisitions* (1984) 132 U. Pa. L.Rev. 647, 706-707.

[2] The "Steinberg Group" consists of defendants, Saul P. Steinberg, Reliance Financial Services Corporation, Reliance Group, Inc., Reliance Group Holdings, Inc., Reliance Insurance Company, Reliance Insurance Company of New York, United Pacific Insurance Company, United Pacific Life Insurance Company, and United Pacific Insurance Company of New York.

hardships involved in granting or denying the injunction incline in plaintiffs' favor.

## FACTS AND PROCEEDINGS BELOW

In March 1984 the Steinberg Group purchased more than two million shares of Disney stock. Probably interpreting this as the opening shot in a takeover war, the Disney directors countered with an announcement Disney would acquire Arvida Corporation for $200 million in newly-issued Disney stock and assume Arvida's $190 million debt.[3] The Steinberg Group countered this move with a stockholders' derivative action in federal court to block the Arvida transaction. Nonetheless, on June 6, 1984, the Arvida transaction was consummated.

Undeterred by its failure to halt Disney's purchase of Arvida, the Steinberg Group proceeded to acquire some two million additional shares of Disney stock, increasing its ownership position to approximately 12 percent of the outstanding Disney shares. On June 8, 1984, the Steinberg Group advised Disney's directors of its intention to make a tender offer for 49 percent of the outstanding shares at $67.50 a share and its intention to later tender for the balance at $72.50 a share. The directors' response was swift. On the evening of the same day, the directors proposed Disney repurchase all the stock held by the Steinberg Group. Agreement was reached on June 11.

Under the agreement with the Steinberg Group, Disney purchased all the stock held by the group for $297.4 million and reimbursed the estimated costs incurred in preparing the tender offer, $28 million, for a total of $325.4 million, or about $77 per share. The Steinberg Group garnered a profit of about $60 million. In return, the Steinberg Group agreed not to purchase Disney stock and to dismiss its individual causes of action in the Arvida litigation. It did not dismiss the derivative claims.

Disney borrowed the entire sum necessary to repurchase its shares. This transaction, coupled with the debt assumed in the Arvida purchase, increased Disney's total indebtedness to $866 million, two-thirds of Disney's entire shareholder equity. Upon the announcement of its agreement with the

---

[3]Like the puff fish, a corporate delicacy will often attempt to avoid being swallowed up by making itself appear less attractive to a potential predator. See, Lowenstein, *supra,* at p. 313; Nathan & Sobel, *Corporate Stock Repurchases In The Context Of Unsolicited Take-over Bids* (1980) 35 Bus. Law. 1545, 1547 & fn. 2; Rosenzweig, *The Legality of "Lock-Ups"* [etc.] (1983) 10 Sec. Reg. L. J., 291, 299; Prentice, *Target Board Abuse Of Defensive Tactics* [etc.] (1983) J. Corp. L. 337, 341, 343; Greene & Junewicz, *supra,* 132 U. Pa. L.Rev. at p. 702.

Steinberg Group, the price of Disney stock dropped below $50 per share. Thus, the Steinberg Group received a price 50 percent above the market price following the transaction.

The gravamen of the action against the Steinberg Group is that it used its tender offer and the Arvida litigation to obtain a premium price for its shares in violation of its fiduciary duties to Disney and the other shareholders. The complaint seeks, among other things, rescission of Disney's repurchase agreement with the Steinberg Group, an accounting and a constructive trust upon all funds the Steinberg Group received from Disney.

After due notice and hearing, the trial court issued a preliminary injunction enjoining the Steinberg Group from transferring, investing or disposing of the profit[4] from its sale of Disney stock except in accordance with the standards applicable to a prudent trustee under Civil Code section 2261. The injunction also requires the Steinberg Group to notify plaintiffs and the court of every change in the form or vehicle of investment of the entire proceeds of the repurchase agreement. The injunction became effective upon plaintiffs' posting an undertaking in the sum of $1 million.

DISCUSSION

## I. SCOPE OF REVIEW

■ Trial courts consider two interrelated questions in deciding whether to issue a preliminary injunction: "1) are the plaintiffs likely to suffer greater injury from a denial of the injunction than the defendants are likely to suffer from its grant; and 2) is there a reasonable probability that the plaintiffs will prevail on the merits. . . . ' "[By] balancing the respective equities of the parties, [the court] concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him." ' [Citations omitted.]" (*Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 206 [211 Cal.Rptr. 398, 695 P.2d 695].) ■ The grant or refusal of a preliminary injunction is, generally speaking, within the discretion of the trial court and its order may be reversed on appeal only if abuse of discretion is shown. (*Gosney* v. *State of California* (1970) 10 Cal.App.3d 921, 924 [89 Cal.Rptr. 390].) Discretion is abused in the legal sense " 'whenever it may be fairly said that in its exercise the court . . . exceeded the bounds of reason or contravened the uncontradicted evi-

---

[4]The profit, for purposes of the preliminary injunction, was defined as the difference paid by defendants for the stock, approximately $63.25 per share, and the total amount received under the repurchase agreement, approximately $77.50 per share, together with income earned on that amount from the date of receipt. This totals approximately $60 million.

dence.'" [Citations omitted.] (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 527 [67 Cal.Rptr. 761, 439 P.2d 889].)

In the case before us, the Steinberg Group contends plaintiffs failed to demonstrate a likelihood of success on the issue of its liability or that they would be harmed in any way if the Steinberg Group maintained unfettered control over the proceeds and profits of the stock sale pending a final decision on the merits. As we review these contentions we bear in mind our inquiry is a limited one: "'The granting or denial of a preliminary injunction does not amount to an adjudication of the ultimate rights in controversy. It merely determines that the court, balancing the respective equities of the parties, concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him.'" [Citations omitted.] (*Continental Baking Co.* v. *Katz, supra,* 68 Cal.2d at p. 528.)

## II. Plaintiffs Demonstrated a Reasonable Probability of Success on the Merits Entitling Them to a Constructive Trust Upon the Profits the Steinberg Group Received From Its Sale of Disney Stock.

### A. *Liability of the Steinberg Group as an Aider and Abettor of the Disney Directors' Breach of Fiduciary Duty.*

Although we have found no case in which a greenmailer was ordered to return his ill-gotten gains, precedent for such a judgment exists in California law.

In *Jones* v. *H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 108-109 [81 Cal.Rptr. 592, 460 P.2d 464], our Supreme Court adopted the shareholders' Magna Carta set forth in *Pepper* v. *Litton* (1939) 308 U.S. 295 [84 L.Ed. 28, 60 S.Ct. 238]: "'"'A director is a fiduciary. . . . So is a dominant or controlling stockholder or group of stockholders. . . . Their powers are powers of trust. . . .'"' '"He who is in such a fiduciary position cannot serve himself first and his *cestuis* second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty. . . . He cannot use his power for his personal advantage and to the detriment of the stockholders. . . . For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the *cestuis*. Where there is a violation of these principles, equity will undo the wrong or intervene to prevent its consummation."'"' The ultimate question "is whether or not under all the circum-

stances the transaction carries the earmarks of an arm's length bargain." (*Id.*, at pp. 306-307 [84 L.Ed. at p. 289].)

*Ahmanson* involved a scheme in which the majority stockholders set up a holding company in a manner which made the minority shares unmarketable. (1 Cal.3d at p. 114.) The court held the facts alleged in the complaint stated a cause of action for breach of fiduciary duty. "[D]efendants chose a course of action in which they used their control of the Association to obtain an advantage not made available to all stockholders. They did so without regard to the resulting detriment to the minority stockholders and in the absence of any compelling business purpose." (1 Cal.3d at p. 114.)

■ While there may be many valid reasons why corporate directors would purchase another company or repurchase the corporation's shares, the naked desire to retain their positions of power and control over the corporation is not one of them.[5] (See *Anderson* v. *Albert & J. M. Anderson Mfg. Co.* (1950) 325 Mass. 343 [90 N.E.2d 541, 544]; *Bennett* v. *Propp* (1962) 41 Del.Ch. 14 [187 A.2d 405, 408]; *Schilling* v. *Belcher* (5th Cir. 1978) 582 F.2d 995, 1003-1005 [Florida law]; 1 Ballantine & Sterling, Cal. Corporation Laws (4th ed. 1984) § 143.02, subd. (d), pp. 8-58-59; Lynch & Steinberg, *The Legitimacy Of Defensive Tactics In Tender Offers* (1979) 64 Cornell L.Rev. 901, 914-915.)

■ If the Disney directors breached their fiduciary duty to the stockholders, the Steinberg Group could be held jointly liable as an aider and abettor. The Steinberg Group knew it was reselling its stock at a price considerably above market value to enable the Disney directors to retain control of the corporation. It knew or should have known Disney was borrowing the $325 million purchase price. From its previous dealings with Disney, including the Arvida transaction, it knew the increased debt load would adversely affect Disney's credit rating and the price of its stock. If it were an active participant in the breach of duty and reaped the benefit, it cannot disclaim the burden. (*Gray* v. *Sutherland* (1954) 124 Cal.App.2d 280, 290 [268 Cal.Rptr. 754]; *Bancroft-Whitney Co.* v. *Glen* (1966) 64 Cal.2d 327, 353 [49 Cal.Rptr. 825, 411 P.2d 921, 24 A.L.R.3d 795].) "Where there is a common plan or design to commit a tort, all who participate are jointly liable whether or not they do the wrongful acts." (*Certified Grocers of California, Ltd.* v. *San Gabriel Valley Bank* (1983) 150 Cal.App.3d 281, 289 [197 Cal.Rptr. 710].)

The Steinberg Group contends there was no evidence presented to the trial court that the repurchase agreement was motivated by the Disney directors' desire to perpetuate their own control instead of a good faith belief the corporate interest would be served thereby. (See *Fairchild* v. *Bank of*

---

[5]We recognize the Disney directors were not parties to the proceedings on the preliminary injunction nor this appeal and have not had the opportunity to tell their side of the story.

*America* (1961) 192 Cal.App.2d 252, 256 [13 Cal.Rptr. 491]; cf. *Klaus* v. *Hi-Shear Corporation* (9th Cir. 1975) 528 F.2d 225, 233 with *Kors* v. *Carey* (1960) 39 Del.Ch. 47 [158 A.2d 136] and *Cheff* v. *Mathes* (1964) 41 Del.Ch. 494 [199 A.2d 548].)

At this point in the litigation, it is not necessary the court be presented with a "smoking gun." We believe the evidence presented to the court was sufficient to demonstrate a probability of success on the merits. The acts of the Disney directors—and particularly their timing—are difficult to understand except as defensive strategies against a hostile takeover. The Steinberg Group began acquiring Disney stock in March 1984. In May 1984 the Disney directors announced Disney would acquire Arvida and its $190 million debt. Trying to make the target company appear less attractive is a well-recognized defensive tactic by a board seeking to retain control. (See fn. 3, *supra.*) Furthermore, the Steinberg Group announced its tender offer for 49 percent of the outstanding Disney shares on June 8, 1984. Immediately following this announcement, the Disney directors began negotiations to repurchase the Steinberg Group's stock and reached an agreement on the repurchase two days later. (Cf. *Joseph E. Seagram & Sons, Inc.* v. *Abrams* (S.D.N.Y. 1981) 510 F.Supp. 860, 861-862.)

■ Once it is shown a director received a personal benefit from the transaction, which appears to be the case here, the burden shifts to the director to demonstrate not only the transaction was entered in good faith, but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. (*Lynch* v. *Cook* (1983) 148 Cal.App.3d 1072, 1082 [196 Cal.Rptr. 544]; and see, Rosenzweig, *supra,* at p. 294.) The only evidence presented by the Disney directors was the conclusory statement of one of its attorneys that "[t]he Disney objective in purchasing [the] stock was to avoid the damage to Disney and its shareholders which would have been the result of [the] announced tender offer." This vague assertion falls short of evidence of good faith and inherent fairness. (Cf. *Schilling* v. *Belcher, supra,* 582 A.2d at p. 1004; *Klaus* v. *Hi-Shear Corporation, supra,* 528 F.2d at p. 233.)

B. *Liability of the Steinberg Group for Breach of Fiduciary Duty to the Disney Shareholders.*

■ When the Steinberg Group filed suit against Disney to block Disney's purchase of Arvida it assumed a fiduciary duty to the other shareholders with respect to the derivative claims.

"A stockholder who institutes [a derivative suit] sues purely as a trustee to redress corporate injuries. He has the unquestioned right to sue, but it is

in no sense his duty to sue. . . . He is a trustee pure and simple, seeking in the name of another a recovery for wrongs that have been committed against that other. His position in the litigation is in every legal sense the precise equivalent of that of the guardian *ad litem.*" (*Whitten* v. *Dabney* (1915) 171 Cal. 621, 629, 630-631 [154 P. 312].) The United States Supreme Court set forth in strong terms the strict obligations of a plaintiff in a derivative suit: "[A] stockholder who brings suit on a cause of action derived from the corporation assumes a position, not technically as a trustee perhaps, but one of a fiduciary character. He sues, not for himself alone, but as representative of a class comprising all who are similarly situated. The interests of all in the redress of the wrongs are taken into his hands, dependent upon his diligence, wisdom and integrity. And while the stockholders have chosen the corporate director or manager, they have no such election as to a plaintiff who steps forward to represent them. He is a self-chosen representative and a volunteer champion." (*Cohen* v. *Beneficial Loan Corp.* (1949) 337 U.S. 541, 549 [93 L.Ed. 1528, 1538, 69 S.Ct. 1221].)

One who assumes such a fiduciary role cannot abandon it for personal aggrandizement. (*Young* v. *Higbee Co.* (1945) 324 U.S. 204, 213 [89 L.Ed. 890, 898, 65 S.Ct. 594]; *Lemer* v. *Boise Cascade, Inc.* (1980) 107 Cal.App.3d 1, 7 [165 Cal.Rptr. 555].) In the case before us plaintiffs have demonstrated a reasonable probability the Steinberg Group breached its fiduciary duty to the other shareholders by abandoning the Arvida litigation.

In its verified complaint in federal district court, Reliance Insurance Company, part of the Steinberg Group, alleged, among other things, that Disney's purchase of Arvida was contrary to sound business judgment and a waste of corporate assets since the purchase price was excessive, the purchase would erode Disney's profitability, substantially increase its debt load and make it more difficult and expensive for Disney to acquire the capital necessary to complete its current projects. It also claimed the Arvida purchase would depress the value of Disney common stock. In bringing the action, Reliance alleged it would fairly and adequately represent the interests of Disney and all other stockholders who were similarly situated.

Despite its dire warnings about the Arvida acquisition and its promise to fairly and adequately represent the interests of Disney and its shareholders, the Steinberg Group abandoned the federal litigation just two weeks after it was filed. The Steinberg Group sold all of its Disney shares to Disney at a $60 million profit, dismissed its individual claims in the Arvida litigation and promised not to oppose any motion to dismiss the derivative claims.

A trier of fact could reasonably find the Steinberg Group did not fairly and adequately represent the Disney shareholders but, instead, used its position as class representative for its own financial advantage.

The Steinberg Group abandoned its derivative claims when it sold its stock back to the corporation. ■ Once a derivative plaintiff sells its stock, it no longer has standing to prosecute the derivative claims on behalf of the remaining shareholders. (See *Lewis* v. *Knutson* (5th Cir. 1983) 699 F.2d 230, 238 and cases cited therein; 7A Wright & Miller, Federal Practice and Procedure (1972) § 1839, p. 437.)

It is argued the Steinberg Group breached no fiduciary duty in merely dismissing its individual claims and selling its stock. It did not dismiss the derivative claims; and the sale of stock, even though to the defendants in the action, is not a "compromise" within the meaning of rule 23.1 of the Federal Rules of Civil Procedure. (See *Malcolm* v. *Cities Service Co.* (D.Del. 1942) 2 F.R.D. 405, 407.)[6] A current shareholder would appear to have the right to intervene in the derivative claims under rule 24(a)(2). (*Malcolm, ibid.*)

The foregoing argument avoids the issue. The Steinberg Group could not have unilaterally dismissed or compromised the derivative claims even if it wanted to. (See rule 23.1, *supra.*) Therefore, the fact it did not do so is not dispositive of plaintiffs' claim of breach of fiduciary duty. In *Shelton* v. *Pargo, Inc.* (4th Cir. 1978) 582 F.2d 1298, the court recognized settlement of the class representative's *individual* claims may indeed affect the fulfillment of the fiduciary duty owed the class.

"The parties, who are settling their individual claims, are not merely members of a putative class; they are the representative parties, without whose presence as plaintiffs the case could not proceed as a class action. Had the appellees been other than the representative parties, there would be no objection to a voluntary settlement of their claim. But, by asserting a representative role on behalf of the alleged class, these appellees voluntarily accepted a fiduciary obligation towards the members of the putative class they thus have undertaken to represent. They may not abandon the fiduciary role they assumed at will or by agreement with the [defendant], *if prejudice to the members of the class they claimed to represent would result or if they have improperly used the class action procedure for their personal aggrandizement.*" (*Id.*, at p. 1305; fns. omitted; italics added.) The court cited as authority, among other cases, *Cohen* v. *Beneficial Loan Corp., supra,* and *Young* v. *Higbee Co., supra,* 324 U.S. 204. (See also *Rothenberg* v. *Security Management Co., Inc.* (11th Cir. 1982) 667 F.2d 958, 961; *Blum* v. *Morgan Guaranty Trust Co. of New York* (5th Cir. 1976) 539 F.2d 1388,

---

[6]The court, in *Malcolm,* did not address the question whether, in selling her standing as a class representative to the defendants, plaintiff breached a fiduciary duty to the other shareholders.

1390; and *G. A. Enterprises, Inc.* v. *Leisure Living Commun., Inc.* (1st Cir. 1975) 517 F.2d 24, 27.) These cases hold a plaintiff breaches the duty to fairly and adequately represent the other shareholders when he uses the derivative action as leverage to achieve his own personal objectives.

While distinguishable on narrow grounds, *Young* v. *Higbee Co.* is a useful precedent in the case before us. In *Young,* two preferred shareholders of the Higbee Company filed objections to the company's reorganization plan which favored junior creditors over preferred stockholders. Plaintiffs lost in the district court and filed an appeal. While the appeal was pending in the circuit court, plaintiffs sold their appeal rights to the junior creditors for about six times the value of their preferred stock. The junior creditors proceeded to dismiss the appeal. Young, a preferred shareholder, sued the turncoat plaintiffs for an accounting. The plaintiffs, now defendants, argued they had appealed only in their own names, not on behalf of the class of preferred stockholders and, therefore, they owed no duty to anyone but themselves. (324 U.S. at pp. 206-209 [89 L.Ed. at pp. 894-896].)

The Supreme Court rejected this argument and held a trust would be imposed on the proceeds from the sale of the appeal rights for the benefit of the remaining preferred shareholders. (*Id.,* at p. 212 [89 L.Ed. at p. 897].) The court reasoned, "[E]ven though their objection to confirmation [of the reorganization plan] contained no formal class suit allegations, the success or failure of the appeal was bound to have a substantial effect on the interests of all other preferred stockholders. The liability of one who assumes a determining position over the rights of others must turn on something more substantial than mere formal allegations in a complaint." (*Id.,* at p. 209 [89 L.Ed. at pp. 895-896].) Although these "plaintiffs" could not be compelled to appeal nor to prosecute an appeal already taken contrary to their own interests (*id.,* at p. 212 [89 L.Ed. at p. 897]) "[t]hey cannot avail themselves of the statutory privilege of litigating for the interest of a class and then shake off their self-assumed responsibilities to others by a simple announcement that henceforth they will trade in the rights of others for their own aggrandizement." (*Id.,* at p. 213 [89 L.Ed. at p. 898].)

The Steinberg Group stresses that in *Young* the claims of the plaintiffs were inseparable from those of the other preferred stockholders who, upon dismissal of the appeal, were bound, under the doctrine of res judicata, to the judgment of the lower court. Here, the Steinberg Group sued on its individual claims as well as derivative claims and the sale of its standing as derivative plaintiff does not bar other shareholders from litigating those same derivative claims.

We do not believe the result in *Young* stemmed from its unusual facts. Rather, it was consistent with a long-established rule of equity, the rule of

individual loyalty, which prevents a fiduciary from profiting at the expense of his beneficiary. (324 U.S. at pp. 213, 214 [89 L.Ed. at p. 898]; and see *Meinhard* v. *Salmon* (1928) 249 N.Y. 458 [164 N.E. 545, 546] [Cardozo, J.].) Furthermore, there are more similarities than dissimilarities between *Young* and the case before us. In both cases the ersatz class representatives sold their standing to pursue the class claims in exchange for a substantial profit to persons with adverse interests. In both cases the plaintiffs did not actually dismiss their actions. Instead, they sold their rights to persons with adverse interests knowing those persons would move to dismiss and with the clear intention of aiding them to do so. In both cases the plaintiffs not only profited but, as we explain below, the other shareholders were damaged by the plaintiffs self-dealing.

In *Young,* the shareholders were damaged by loss of the right to appeal from an unfavorable judgment. In the case at bench, the Steinberg Group not only sold its right to pursue the derivative claims, it affirmatively promised not to oppose dismissal of those claims. This agreement not only undercuts the merits of the suit, it could be interpreted to mean the Steinberg Group will refuse to cooperate with a potential substitute plaintiff by sharing informal discovery, legal research and the like. Thus, even assuming another shareholder picks up the gauntlet, the cause has become sidetracked and possibly more difficult and expensive due to the action of the Steinberg Group. Furthermore, as shown below, the stockholders and Disney are in a worse position financially than before the Steinberg Group intervened into their corporate affairs.

The duty of the plaintiff in a derivative suit is analogous to the duty of care owed by a volunteer rescuer to the rescuee. It is significant that both the California and United States Supreme Courts focused on the volunteer status of a plaintiff in a derivative action, a "volunteer champion" in the words of Justice Jackson. (*Cohen* v. *Beneficial Loan Corp.*, *supra,* 337 U.S. at p. 549 [93 L.Ed. at p. 1538]; and see *Whitten* v. *Dabney, supra,* 171 Cal. at p. 629.) Under tort law principles one who, having no initial duty to do so, undertakes to come to the aid of another is under a duty to exercise due care in performance and is liable if failure to exercise such care increases the risk of harm or the harm is suffered because of the other's reliance upon the undertaking. (*Williams* v. *State of California* (1983) 34 Cal.3d 18, 23 [192 Cal.Rptr. 233, 664 P.2d 137]; Rest. 2d Torts, § 323, p. 135.) Although we are not concerned here with physical harm, we believe the analogy apt.

In filing its derivative suit, the Steinberg Group volunteered to prevent Disney from acquiring the large debt associated with Arvida "which," it alleged, "could materially diminish Disney earnings and . . . threaten its

long-term profitability." Instead of preventing the Arvida acquisition, the Steinberg Group bailed out of the lawsuit, and out of Disney, with $325 million of Disney's money. According to plaintiffs, Disney borrowed the entire amount used to buy off the Steinberg Group. This loan together with the $190 million Arvida debt increased Disney's total indebtedness to about $830 million compared to about $585 million before the Steinberg Group came on the scene. This increased debt load resulted in a lowering of Disney's credit rating and a plunge of 16 points in the price of Disney stock from 65⅛, the trading day before the repurchase agreement, to 49½ a week later.

Thus, it can be argued, with a reasonable probability of success, the Disney shareholders are worse off after the intervention of their "volunteer champion" than they were before. They are like the citizens of a town whose volunteer fire department quits fighting the fire and sells its equipment to the arsonist who set it (who obtains the purchase price by setting fire to the building next door).

We conclude, therefore, plaintiffs have established a reasonable probability of success on the claim the Steinberg Group breached its fiduciary duty as a plaintiff in the stockholders' derivative action.[7]

C. *Entitlement to a Constructive Trust.*

The Steinberg Group contends even if plaintiffs ultimately prevail in this action they would not be entitled to a constructive trust because they have an adequate remedy at law in the form of money damages. The adequacy of that remedy is demonstrated by the facts the proceeds consist of an ascertainable fund of money and there is no serious question as to the solvency of any of the defendants. (Cf. *West Coast Constr. Co.* v. *Oceano Sanitary Dist.* (1971) 17 Cal.App.3d 693, 700 [95 Cal.Rptr. 169].) We disagree.

---

[7]Plaintiffs also contend the Steinberg Group violated the fiduciary duty owed by controlling shareholders to the other shareholders, (see, e.g., *Jones* v. *H. F. Ahmanson & Co., supra,* 1 Cal.3d at pp. 109-111; Brudney, *Equal Treatment of Shareholders in Corporate Distributions and Reorganizations* (1983) 71 Cal.L.Rev. 1072, 1106-1114; Berle, *The Price of Power: Sale of Corporate Control* (1965) 50 Cornell L.Q. 628) and that it engaged in unfair business practices in violation of Business and Professions Code section 17200.

Having already found adequate grounds to support the preliminary injunction, we need not address the novel question whether greenmailing is an unfair business practice within the meaning of section 17200.

The record is inadequate at this time on the question whether the Steinberg Group was a controlling shareholder when it sold its stock to Disney. Although it never owned more than about 12 percent of the outstanding Disney stock this is not determinative of control. The question, a factual one, is what amount of influence it could exert on the corporation by reason of its holdings. (See Berle, *supra,* at p. 630; Brudney, *supra,* at p. 1073, fn. 2.)

■ In California, as in most jurisdictions, an action in equity to establish a constructive trust does not depend on the absence of an adequate legal remedy. (*Bacon* v. *Grosse* (1913) 165 Cal. 481, 493 [132 P. 1027].) A constructive trust is "[t]he usual theory" upon which a plaintiff recovers wrongfully acquired assets. Only where the constructive trustee has dissipated the fund that would constitute the res of the constructive trust is it proper to award a judgment for money damages. (*St. James Armenian Church of Los Angeles* v. *Kurkjian* (1975) 47 Cal.App.3d 547, 553 [121 Cal.Rptr. 214].) Numerous cases have recognized the plaintiff's right to a constructive trust over a fund of money regardless of the defendant's solvency. In addition to *St. James, supra,* see, *Gray* v. *Sutherland, supra; Bank of America* v. *Ryan* (1962) 207 Cal.App.2d 698, 709-710 [24 Cal.Rptr. 739]; *Efron* v. *Kalmanovitz* (1967) 249 Cal.App.2d 187, 196 [57 Cal.Rptr. 248]; *Shepherd* v. *Miles & Sons, Inc.* (1970) 10 Cal.App.3d 7, 11-14 [89 Cal.Rptr. 23]; *Zumbrun* v. *University of Southern California* (1972) 25 Cal.App.3d 1, 14 [101 Cal.Rptr. 499, 51 A.L.R.3d 1]; *Alexandrou* v. *Alexander* (1974) 37 Cal.App.3d 306, 320-321 [112 Cal.Rptr. 307]; *Weiss* v. *Marcus* (1975) 51 Cal.App.3d 590, 600 [124 Cal.Rptr. 297]. (See also Bogert, Trusts and Trustees (2d ed. rev. 1978) § 472, pp. 37-40; Rest., Restitution, § 160, com. e.) While there are jurisdictions that subscribe to defendants' view, they are in the minority. (See, e.g., *Markel* v. *Transamerica Title Insurance Company* (1968) 103 Ariz. 353 [442 P.2d 97, 105-106]; and see 5 Scott on Trusts (3d ed. 1967) § 462.3, pp. 3418-3419.)[8]

It must be said there is little or no discussion in these authorities on the question whether the plaintiff had an adequate remedy at law. In *Bacon* v. *Grosse, supra,* the court held that where, as in the case before us, there is a pre-existing fiduciary relationship between the parties the question of an adequate remedy at law does not arise. " 'The court, as a court of equity, acquires jurisdiction of the action, not because damages at law would be inadequate, but because it is an action to enforce a trust . . . .' " (165 Cal.

---

[8]The cases cited by defendants do not support their position. To the contrary, *Johnson* v. *Clark* (1936) 7 Cal.2d 529 [61 P.2d 767] held that a complaint alleging defendant had sold plaintiff's business, and retained the proceeds in violation of a fiduciary relationship, stated a cause of action for constructive trust. In *Elliott* v. *Elliott* (1964) 231 Cal.App.2d 205, 209 the court recognized "the right of a beneficiary under a constructive trust to obtain a money judgment in lieu of a *destroyed* res . . . ." (Italics added.) The court in *Angelus Securities Corp.* v. *Luton* (1941) 47 Cal.App.2d 262 [117 P.2d 741] upheld the imposition of a constructive trust upon stock certificates while noting the constructive trustee was not required to return the identical certificates. (*Id.,* at pp. 267-268.)

There is dictum in *Allen* v. *Powell* (1967) 248 Cal.App.2d 502 [56 Cal.Rptr. 715, 29 A.L.R.3d 1218] that because a constructive trust is an equitable remedy, the plaintiff's remedy at law must be inadequate. (*Id.,* at p. 509.) The cases cited by the court do not support its conclusion. This dictum is inconsistent with the holdings in the cases cited *supra,* and has not been followed. We will not follow it here.

at p. 493.) There is abundant historical precedent for the court's holding. (See Note, *"Must The Remedy At Law Be Inadequate Before A Constructive Trust Will Be Impressed?"* 25 St. John's L.Rev. 253, 289-290, 292.) In *Bainbridge* v. *Stover* (1940) 16 Cal.2d 423 [106 P.2d 423], also involving a preexisting fiduciary duty, the court suggested one whose property has been wrongfully acquired by the defendant is, as a matter of justice, entitled to greater solicitude than a mere creditor of the defendant.

"The person holding the property may have acquired it through fraud, undue influence, breach of trust, or in any other improper manner and he is usually personally liable in damages for his acts. But the one whose property has been taken from him is not relegated to a personal claim against the wrongdoer which might have to be shared with other creditors; he is given the right to a restoration of the property itself." (*Id.*, at pp. 428-429; and see 5 Scott on Trusts, *supra,* § 521.3, p. 3659; Note, *supra,* 25 St. John's L.Rev. at pp. 288-289.)

Money damages are also inadequate if, by that term, it is meant plaintiff is entitled to a judgment equal to the amount of money defendant wrongfully acquired plus the legal rate of interest. The purpose of the constructive trust remedy is to prevent unjust enrichment and to prevent a person from taking advantage of his own wrong. (*Martin* v. *Kehl* (1983) 145 Cal.App.3d 228, 237 [193 Cal.Rptr. 312] and cases cited therein.) Thus, under a constructive trust upon money, the plaintiff is entitled to trace the fund to its ultimate product or profit. (*Brodie* v. *Barnes* (1942) 56 Cal.App.2d 315, 321-323 [132 Cal.Rptr. 595]; *Haskel Engineering & Supply Co.* v. *Hartford Acc. & Indem. Co.* (1978) 78 Cal.App.3d 371, 375 [144 Cal.Rptr. 189].) By the time plaintiff obtains a final judgment, the original fund may have grown far greater than the legal rate of interest would recognize. To allow the defendant to pocket the difference would reward the defendant for his wrongdoing.

For the reasons stated above, we believe plaintiffs have established a reasonable likelihood of entitlement to a constructive trust.

III. The Trial Court Reasonably Concluded Injunctive Relief Was Necessary to Prevent the Dissipation or Disappearance of the Proceeds and Profits of the Transaction.

Code of Civil Procedure section 526, first subdivision 3, authorizes a preliminary injunction "[w]hen it appears, during the litigation, that a party to the action is doing, or threatens, or is about to do, . . . some act in violation of the rights of another party to the action respecting the subject of the action, and tending to render the judgment ineffectual; . . ."

An injunction against disposing of property is proper if disposal would render the final judgment ineffectual. (*Wilkins* v. *Oken* (1958) 157 Cal.App.2d 603, 606-607 [321 P.2d 876].) Thus, in a case similar to the one before us, a preliminary injunction was granted to restrain the disposal of property pending the result of an accounting. (*Raisch* v. *Warren* (1912) 18 Cal.App. 655, 667 [124 P. 95].) To paraphrase Justice Cardozo, if "[a] constructive trust is the [voice] through which the conscience of equity finds expression,"[9] then a court can surely prevent the stifling of that voice before it has a chance to be heard.

In order to create a constructive trust there must be an existing res (property or some interest in the property). (*Calistoga Civic Club* v. *City of Calistoga* (1983) 143 Cal.App.3d 111, 116 [191 Cal.Rptr. 571]; see also *Elliott* v. *Elliott, supra,* 231 Cal.App.2d at p. 209; *Angelus Securities Corp.* v. *Luton, supra,* 47 Cal.App.2d at p. 268.) Clearly, the equitable remedy of constructive trust would be ineffectual if the trustee were permitted to defeat recovery by wrongfully permitting the res to be dissipated. Similarly, the remedy of constructive trust is defeated if plaintiffs are unable to trace the trust property into its succeeding transfigurations. (*Walsh* v. *Majors* (1935) 4 Cal.2d 384, 399 [49 P.2d 598]; *Efron* v. *Kalmanovitz, supra,* 249 Cal.App.2d at pp. 195-196; 5 Scott on Trusts, *supra,* § 521.3, pp. 3657-3659.)

The purpose of the injunction in this case was not to lessen the difficulty of determining damages. (Cf. *Voorhies* v. *Greene* (1983) 139 Cal.App.3d 989, 997 [189 Cal.Rptr. 132].) Its purpose was to restrain the Steinberg Group from dissipating the profit from the sale of Disney stock and, thereby, destroying plaintiffs' equitable remedy of constructive trust. (Cf. *Steinmeyer* v. *Warner Cons. Corp.* (1974) 42 Cal.App.3d 515, 520 [116 Cal.Rptr. 57].) As discussed below, the trial court had sufficient evidence to believe dissipation of the profit was already occurring. Thus, absent injunctive relief, plaintiffs would be left with a "naked claim for damages . . . to be obtained through an action at law." (*Lathrop* v. *Bampton* (1866) 31 Cal. 17, 23.) Instead of obtaining the income the fund could have earned if invested, plaintiffs would be entitled only to simple interest at the legal rate of 7 percent per annum. (See Civ. Code, § 2262: "If a trustee omits to invest trust moneys . . . he must pay simple interest thereon, if such omission is negligent merely, and compound interest if it is willful."; and see *Lynch* v. *John M. Redfield Foundation* (1970) 9 Cal.App.3d 293, 302 [88 Cal.Rptr. 86, 51 A.L.R.3d 1284].)[10]

---

[9]*Beatty* v. *Guggenheim Exploration Co.* (1919) 225 N.Y. 380 [122 N.E. 378, 380].

[10]The court in *Lynch* noted some treatise support for a more liberal standard than the legal rate of interest, e.g., the usual rate of return on trust investments. (*Ibid.;* but see Civ. Code,

The Steinberg Group attacks the court's implicit conclusion that, absent a preliminary injunction, the proceeds and profits of the transaction are likely to be dissipated or become exceedingly difficult to trace. Specifically, the group attacks plaintiffs' expert witness as unqualified to render an opinion to that effect. We need not pass on the qualifications of plaintiffs' expert because we believe the court could draw its own conclusions from the undisputed facts contained in the expert's declaration and the counterdeclaration and depositions of officers of defendant Reliance Insurance Company.

Plaintiffs' expert states that for the years 1981-1983 Reliance lost money on its underwriting activities and made money on its investments. Reliance does not dispute this. In fact, its declaration concedes "[a] large fund of . . . short-term instruments is often necessary to meet cash flow demands, the most important of which is satisfaction of policyholders' claims." Furthermore, a Reliance official testified in deposition that prior to the injunction the Disney proceeds had been used to pay claims, taxes and a bank loan.

The trial court could reasonably conclude from this evidence Reliance investment income subsidizes its underwriting losses and, absent an injunction, the proceeds and profits of the transaction would be dissipated by the time a final judgment could be obtained. Plaintiffs would be left with a constructive trust on the fender of a Buick in Ypsalanti.

The Steinberg Group also claims the preliminary injunction will cause undue hardship to Reliance Insurance, the primary recipient of the proceeds.

Reliance contends the injunction will irreparably harm its business reputation by creating the impression the company may not be able to meet its financial obligations to its policyholders. Harm to Reliance's business reputation appears unlikely in light of the company's claims it has been in business for 150 years; it is the 25th largest property and casualty insurance group in the United States; it has assets in excess of $1.4 billion and earned revenues of $1.3 billion in 1983; and, it has an A plus rating from the most respected rater of insurance companies.

Next, Reliance contends the injunction prohibits it from investing its funds in the manner it deems appropriate. Reliance's investment policies are described in a declaration submitted by its chief financial officer and senior vice president. This declaration states Reliance "is obliged to main-

---

§ 2262, *supra*.) We have found no California case law holding the trustee liable for the amount of income the trust res reasonably could have earned had it not been dissipated. Furthermore, the Steinberg Group, while urging the plaintiffs have an adequate remedy at law, refused to stipulate to this standard of damages at oral argument.

tain a prudent and balanced investment portfolio consisting of both long-term and short-term investments." Its investments are selected in accordance with two primary goals: "minimization of risk and maximization of return." These goals "are best accomplished through a balanced portfolio which is diversified as to investment instruments and maturities." We see no inconsistency between the "prudent trustee" standard of Civil Code section 2261 and the policies already followed by Reliance in its investments. Thus, Reliance has failed to show it would suffer any injury from the injunction in this respect.

In a related argument, Reliance contends prudent investments in accordance with California law will reduce its investment income which, in turn, will reduce the amount of underwriting it can undertake thereby reducing the company's profit. Not only has Reliance failed to introduce any evidence to support this argument, the argument is contradicted by the declaration of its chief financial officer. (See discussion, *supra*.)

Finally, Reliance contends the requirement it notify the court of every change in investment of the funds received from the sale of Disney stock is harassing, onerous, and burdensome. Again, no evidence was submitted to support this claim. We find this requirement to be within the latitude afforded the trial court in shaping preliminary relief.

### DISPOSITION

The array of law and facts advanced by plaintiffs evaluated against defendants' countercontentions demonstrates a reasonable probability that plaintiffs will be successful although, we stress, the final decision must await trial and a trial might well produce a different result. As to hardship, we believe the trial court reasonably concluded detriment to the plaintiffs if the proceeds and profits are dissipated or untraceable exceeds any hardship to the Steinberg Group in complying with the investment and accounting provisions of the preliminary injunction.

The order granting a preliminary injunction is affirmed.

Thompson, Acting P. J., and Harris, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.